**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

IN RE CIGNA ERISA LITIGATION          MASTER FILE NO.: 2:25-cv-02465

THIS DOCUMENT RELATES TO:

All Actions

## CONSOLIDATED COMPLAINT

Plaintiffs, Amanda Reven, Antoinette Argentine, Sean Hicks, Andria Adams, Heather Montesanti, and Danielle Ulshafer ("Plaintiffs"), by and through their attorneys, on behalf of The Cigna Group 401(k) Plan (f/k/a the Cigna 401(k) Plan[1]) (the "Plan"),[2] themselves and all others similarly situated, bring this class action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA") for the benefit of the Plan and its participants and beneficiaries. This action asserts claims for breaches of fiduciary duties and other violations of ERISA between May 14, 2019 through the date of any judgment in this litigation (the "Class Period"), against the Plan's fiduciaries, which include: Defendants The Cigna Group ("Cigna" or "Company"), The Cigna Group Retirement Plan Committee (the "Committee"), and John and Jane Does 1-30 in their capacities as members of the Committee (individually sometimes "Defendant,"

---

[1] Effective as of February 13, 2023, "the Plan's name was changed from Cigna 401(k) Plan to The Cigna Group 401(k) Plan." Report of Independent Auditors ("Auditor's Report"), attached to the 2023 Form 5500 for the Plan ("2023 Form 5500"), at 3.

[2] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

and, collectively, "Defendants" or "Plan Fiduciaries"). In support thereof, Plaintiffs state and allege as follows:

## I.    INTRODUCTION

1.    The Plan is a defined contribution retirement plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* The Cigna Group 401(k) Plan (As amended and restated effective as of January 1, 2025) ("Plan Doc."), at 1 ("[T]his Plan is intended to constitute a profit-sharing plan and a defined contribution plan for purposes of the Code and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), with a 'qualified cash or deferred arrangement' under Code Section 401(k) and a 'qualified automatic contribution arrangement' under Code Section 401(k)(13).").

2.    To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

3.    The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers.";[3] *see also Tibble v. Edison Int'l,*

---

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited September 29, 2025).

135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022).

8.      Plaintiffs allege that during the putative Class Period, Defendants, as a "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached

the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

9.    At all times during the Class Period, the Plan had over nine billion dollars in assets under management. At the start of the Class Period in 2019, the Plan had $9,922,258,471 in assets under management. *See* 2019 Form 5500 for the Plan ("2019 Form 5500"), Schedule H at 2.

10.    By 2023, the Plan had $12,937,846,663 in assets under management. *See* 2023 Form 5500, Schedule H at 2.

11.    The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2021, only 0.2 percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under management.[4] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plan.[5]

12.    As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

13.    The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 77,695 participants. *See* 2019 Form 5500, at 2. By 2023, the Plan had 88,684 participants. *See* 2023 Form 5500, at 2. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the

---

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 123 defined contribution plans (401k, 401a, and 403b) in the country with over 50,000 plus participants with account balances.

14.    With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain stable-value investment with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

15.    Specifically, Defendants allowed substantial assets in the Plan to be invested in the Plan's Fixed Income Fund ("Cigna FIF"), that "is supported by four separate fully benefit-responsive investment contracts, including a traditional investment contract and three synthetic investment contracts." Report of Independent Auditors ("Auditor's Report"), attached to 2019 Form 5500 for the Plan, at 13. The Cigna FIF invested in a traditional guaranteed investment contract ("GIC") with Prudential Retirement Insurance & Annuity Co. ("PRIAC")[6] and three synthetic GICs offered by Prudential Insurance Company of America ("PICA"), Voya Retirement Insurance and Annuity Company ("VRIAC"), and Massachusetts Mutual Life Insurance Company ("MassMutual") (collectively, PRIAC, PICA, VRIAC and MassMutual are referred to as the "Insurance Companies"), that provided  significantly lower rates of return than comparable stable value funds that Defendants could have made available to Plan participants.

---

[6] From at least 2019 through 2022, the traditional guaranteed investment contract was with Prudential Retirement Insurance and Annuity Company ("PRIAC"). "Prudential Retirement Insurance and Annuity Company, was acquired by Empower on April 1, 2022 and renamed EAIC." *See* Report of Independent Auditors, attached to 2022 Form 5500 for the Plan, at 7.

16.    A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.*, preservation of investment assets.

17.    The Insurance Companies benefited significantly from participants in the Plan investing in the Cigna FIF. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the Cigna FIF was benefitting the Insurance Companies at the expense of the participants in the Plan.

18.    Plaintiffs also allege that Defendants further breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by failing to "defray[] reasonable expenses of administering the [Plan]." 29 U.S.C. § 1104(a)(A)(ii). Their failure stems from the use of Plan participant forfeited funds ("Forfeited Plan Assets") to reduce employer contributions to the Plan instead of using the funds to reduce or eliminate the amounts charged to Plan participants for Plan administrative costs, as required by ERISA. The failure to use Forfeited Plan Assets to defray Plan expenses was a clear breach of the duties of prudence and loyalty to Plan participants and, alone, cost Plan participants at least $17.5 million.

19.    During the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*: (i) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (ii) failing to defray reasonable expenses of administering the Plan.

20.    Defendants' mismanagement of the Plan and failure to prudently and loyally use Forfeited Plan Assets, to the detriment of participants and beneficiaries, constitutes, *inter alia*, a

breach of the fiduciary duty of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

21.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), breach of the fiduciary duty to follow Plan terms (Count II) breach of the fiduciary duty of loyalty (Count III), breach of ERISA's Anti-Inurement Provision (Count IV); failure to monitor fiduciaries (Count V); violation of ERISA's prohibited transactions (Count VI); and violations of ERISA's prohibition on self-dealing (Count VII).

## II.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

23.     This Court has personal jurisdiction over Defendants because the Plan is administered in this District meaning The Cigna Group transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

24.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because The Cigna Group does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

7

**Plaintiffs**

25.     Plaintiff, Amanda Reven ("Reven"), resides in Indianapolis, Indiana. During her employment, Plaintiff Reven participated in the Plan. Ms. Reven invested in the Cigna FIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Cigna FIF. Plaintiff Reven also suffered injury as a result of Defendants' failure to use Forfeited Plan Assets to pay Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Reven's individual account.

26.     Plaintiff, Antoinette Argentine ("Argentine"), resides in Copley, Ohio. During her employment, Plaintiff Argentine participated in the Plan. Ms. Argentine invested in the Cigna FIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Cigna FIF. Plaintiff Argentine also suffered injury as a result of Defendants' failure to use Forfeited Plan Assets to pay Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Argentine's individual account.

27.     Plaintiff Sean Hicks ("Hicks") resides in the State of New York. During his employment, Plaintiff Hicks participated in the Plan. Plaintiff Hicks suffered injury as a result of Defendants' failure to use Forfeited Plan Assets to pay Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Hick's individual account.

28.     Plaintiff Andria Adams ("Adams") resides in the During her employment, Plaintiff Adams participated in the Plan. Plaintiff Adams invested in the Cigna FIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Cigna FIF. Plaintiff Adams also suffered injury as a result of Defendants' failure to use Forfeited Plan Assets to pay

Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Adams' individual account.

29.     Plaintiff Heather Montesanti ("Montesanti") resides in the State of Florida. During her employment, Plaintiff Montesanti participated in the Plan. Plaintiff Montesanti invested in the Cigna FIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Cigna FIF.  Plaintiff Montesanti also suffered injury as a result of Defendants' failure to use Forfeited Plan Assets to pay Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Montesanti's individual account.

30.     Plaintiff Danielle Ulshafer ("Ulshafer") resides in the State of New Jersey. During her employment, Plaintiff Ulshafer participated in the Plan. Plaintiff Ulshafer suffered injury as a result of Defendants' failure to use Forfeited Plan Assets to pay Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Ulshafer's individual account.

31.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

32.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

9

### Company Defendant

33.    The Cigna Group (defined above as "Cigna" or the "Company"), is the sponsor of the Plan with a principal place of business at 1601 Chestnut Street, Philadelphia, Pennsylvania. *See* 2023 Form 5500 for the Plan, at 1.

34.    "The Cigna Group is a global health company committed to a better future built on the vitality of every individual and every community." *See* https://investors.thecignagroup.com/overview/default.aspx last accessed on September 29, 2025.

35.    Cigna's employees are an integral part of its mission.

36.    Cigna was/is a party in interest under ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C), and a Plan Fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A), to the extent that it appointed members of the Committee and otherwise exercised discretion over the administration and management of the Plan and/or control of Plan assets.

37.    Accordingly, during the putative Class Period, Cigna is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

38.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### The Cigna Group Retirement Plan Committee

39.    "The Retirement Plan Committee shall be a 'named fiduciary' with respect to this Plan within the meaning of ERISA, and as permitted or required by law, shall have exclusive authority and discretion to control and manage the operation and administration of this Plan, subject to proper delegation." Plan Doc. at 87; *see also* The Cigna Group 401(k) Plan Summary

10

Plan Description (Part I of the Plan Prospectus) Effective January 1, 2024 ("SPD"), at 51 (identifying the Retirement Plan Committee as "Named Fiduciary").

40.    "The Retirement Plan Committee, or one or more fiduciaries named by the Retirement Plan Committee, or any delegate of either, shall from time to time select Investment Funds into which contributions under this Plan may be allocated." Plan Doc. at 52; *see also* Auditor's Report, attached to 2023 Form 5500, at 7 ("The Retirement Plan Committee is responsible for, among other things, selecting and monitoring the Plan's investments.").

41.    Each member of the Retirement Plan Committee during the putative Class Period (referred to herein as John Does 1-30) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each had control over Plan management and/or authority or control over management or disposition of Plan assets.

42.    The Retirement Plan Committee and individual Members of the Retirement Plan Committee (i.e., John Doe defendants) during the Class Period are collectively referred to herein as the "Committee Defendants.

## IV.    FIDUCIARY STANDARDS REQUIRED UNDER ERISA

43.    ERISA was enacted to protect the interests and benefits of employee benefit plan participants and established very important minimum standards for the conduct of plan fiduciaries.

44.    The strict fiduciary duties of loyalty and prudence apply to the fiduciaries of retirement and health and welfare plans governed by ERISA. 29 U.S.C. § 1104(a)(1) provides in relevant part that:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-
>
> (A)    for the exclusive purpose of:
>
>    (i)  providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

* * *

(D)    in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA with exceptions not applicable].

45.    Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

46.    Under ERISA, fiduciaries who exercise any authority or control over plan assets or the administration of a plan must act prudently and for the exclusive benefit of participants in the plan. Fiduciaries cannot act for the benefit of themselves and must ensure that the amount of fees paid from plan assets are no more than reasonable. 29 U.S.C. § 1104(a)(1)(A)(ii); *see also id*. § 1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan" and shall not inure to the benefit of the employer).

47.    Congress also recognized that certain types of transactions are susceptible to abuse by fiduciaries. As a result, Congress enacted Section 406 of ERISA. Section 406(a) prohibits ERISA plan fiduciaries from causing their plans to engage in certain specific transactions with parties-in-interest. In pertinent part, ERISA Section 406(a) provides in relevant part:

A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect-

(A) sale or exchange, or leasing, of any property between the plan and the party in interest;

12

(B) lending money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any asset of the plan;

29 U.S.C. § 1106(a)(1).

48.     Congress also recognized that ERISA fiduciaries, by virtue of their responsibilities, would have ample opportunity to engage in transactions whereby they: (1) engage in self-dealing with plan assets; (2) act as fiduciaries to the plan in the transaction while also representing or acting on behalf of other parties to the transaction whose interests are adverse to the plan, its participants, or its beneficiaries; and (3) receive consideration from any party to the transaction for performing the transaction.

49.     Therefore, in Section 406(b) of ERISA, Congress flatly prohibited, with no exceptions, transactions whereby an ERISA fiduciary engages in a transaction (1) that is tantamount to fiduciary self-dealing, (2) in which the fiduciary has a conflict of interest, or (3) in which the fiduciary receives consideration (i.e., "kickbacks") for executing the transaction. The statute provides that:

A fiduciary with respect to a plan shall not—

>  (1)     deal with the assets of the plan in his own interest or for his own account,

>  (2)     in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

>  (3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

13

50.     "Section [1106](b) prohibits a plan fiduciary from engaging in various forms of self-dealing. Its purpose is to 'prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito, J.) (quoting H.R. Rep. No. 93-1280 (1974)).

51.     According to the DOL, ERISA's Section 406(b)'s

> [P]rohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.

29 C.F.R. § 2550.408b-2(e)(1).

52.     Under the plain language of the statute, the duties of loyalty and prudence imposed by 29 U.S.C. § 1104(a)(1) require that when fiduciaries are presented with alternatives (in conduct or interpretation), the fiduciaries must choose the alternative that solely considers the interests of plan participants exclusively to fulfill the requirement to both (1) provide "benefits to participants"; *and* (2) "defray reasonable expenses of administering the plan," if an alternative that achieves both purposes is available. (emphasis added). *See Rozo v. Principal Life Ins. Co.*, 48 F.4th 589, 593 (8th Cir. 2022) (stating fiduciary decisions must be made with "an eye single to the interests of the participants.").

53.     ERISA's duty of loyalty requires fiduciaries to act "solely in the interest of the [plan's] participants and beneficiaries." *Cunningham v. Cornell Univ.*, 145 Ct. 1020, 1025 (2025) (quoting 29 U.S.C. § 1104(a)(1)(A)). "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick By & Through Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996) (citation omitted).

14

54.    Moreover, subsection (a)(1)(D) of 29 U.S.C. § 1104 makes explicit that the approach set forth above exists regardless of any terms of a written plan document that may be interpreted to the contrary, stating that the provisions of all plans must be "consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104(a)(1)(D).

55.    This is also made explicit in ERISA's anti-inurement provision which prohibits employers from using plan assets for their own benefit. 29 U.S.C. § 1103(c)(1) provides in relevant part that, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries *and* defraying reasonable expenses of administering the plan."

56.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enables breaches by other fiduciaries. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

57.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## V.    THE PLAN

58.    "The Cigna Group 401(k) Plan ("Plan") is sponsored by The Cigna Group ("The Cigna Group"), previously Cigna Corporation, and prior to that, Cigna Holding Company (referred to hereinafter as "Cigna" or "The Cigna Group"), for the benefit of eligible employees and the eligible employees of a participating company." Plan Doc. at 1.

59.    The Plan was created and funded several years prior to the Class Period.

60.    The Plan was amended and restated effective January 1, 2025 stating: "Cigna intends that except where a different effective date is provided herein or required by law, the Plan, as amended and restated, effective January 1, 2025, shall apply to all Employees (or former Employees) who remain or become Participants in the Plan; provided, however, that the provisions of the Plan in effect relating to either (a) benefits provided under the Plan, (b) eligibility to participate in the Plan, or (c) vesting of benefits under the Plan as of a Participant's Severance from Employment with Cigna and all Related Companies shall apply." *Id*. at 2.

61.    "The Cigna Group 401(k) Plan (Plan) helps [employees] save for retirement and other long-range financial goals. When [employees] join the Plan, [they] will have a savings-type account that holds the contributions you and Cigna make to the Plan as well as the investment returns on those contributions. [Employee's] Plan account and all other Plan assets are held in a trust fund that is separate from Cigna's assets." SPD at 1.

16

62. The Plan is a defined contribution, profit sharing plan. *See* SPD at 51; *see also* Plan Doc. at 16 (The Plan is "a defined contribution profit sharing plan.").

63. Employees are automatically enrolled in the Plan 30 to 45 days after their date of hire. *See* SPD at 1 ("Automatic enrollment occurs 30 to 45 days after you are hired (or rehired) as an eligible employee or have a status change to an eligible employee.").

64. Included in the Plan's investment options is the "fixed income fund." Auditors Report attached to 2023 Form 5500, at 7 ("The Plan's investment options include a fixed income fund, which is supported by both traditional and synthetic fully benefit-responsive investment contracts.").

65. "The Fixed Income Fund functions as a 'fund of funds' and blends the crediting rates of the individual investment contracts to create a single melded crediting rate for the Fixed Income Fund." *Id*.

66. At the end of 2023, $3,808,952,000 in Plan assets were invested in the Cigna FIF. *See id*. at 14.

67. The Cigna FIF consists of three synthetic GICs and one traditional GIC. *See id*. at 14-15.

68. The chart below demonstrates the amount of Plan assets invested in the Cigna FIF during the Class Period.

| Plan Year | Plan Assets in the Cigna FIF |
|---|---|
| 2019 | $3,091,873,000 |
| 2020 | $3,488,571,000 |
| 2021 | $3,697,864,000 |
| 2022 | $3,685,084,000 |
| 2023 | $3,808,952,000 |

***Eligibility***

69.     Typically, employees are eligible to participate in the Plan on their first day of employment. *See* Plan Doc. at 20 ("An Employee shall be eligible to become a Participant in this Plan on the date on which he becomes an Eligible Employee.").

### Contributions

70.     There are different types of contributions that participants can make to their Plan account. *See* SPD at 2 ("You make regular Plan contributions by payroll deduction from your eligible earnings. You can make pre-tax contributions, Roth 401(k) contributions, or both.").

71.     Cigna matches participant contributions up to 5% of participants' eligible earnings. *See* SPD at 4 ("Cigna contributes: One dollar for each dollar of regular contributions you make of up to 4% of your eligible earnings; and 50 cents for each dollar of regular contributions you make in excess of 4% and up to 6% of your eligible earnings.").

72.     "Employer Contributions. Each Participating Company shall or may make, as applicable, contributions to this Plan by making payments to the Trustee as required or may be required under the following sections." Plan Doc. at 22.

### Vesting

73.     Participants are immediately vested in their contributions. *See* SPD at 4 ("you are always 100% vested in your own Plan contributions.").

74.     For employer contributions, participants "become 100% vested in matching contributions that Cigna makes for plan years after December 31, 2009 once [they] have two years of vesting service." *Id.*

75.     The Plan provides that "If you terminate employment before you become 100% vested, you will forfeit any unvested matching contributions that Cigna made to your account." *Id.*

### Forfeitures

76. For at least some portion of the Class Period prior to January 1, 2025, the Plan required the Plan Fiduciaries to use Forfeited Plan Assets to first to pay Plan expenses prior to using Forfeited Plan Assets to reduce employer matching contributions. *See* SPD at 24 ("Cigna uses forfeited funds first to pay expenses of the Plan (other than routine administrative expenses) as directed and approved by the Plan Administrator, and second, to reduce the cost of future company matching contributions.")

77. As of January 1, 2025 the Plan provided that "[t]he amount in a Participant's Account which is forfeited in accordance with §8.3(a)(1) shall, during the continuation of the Plan, be applied towards the contributions made pursuant to §§3.4, 3.5 and 3.6. To the extent the Participating Companies choose not to apply all or any portion of such forfeitures towards such contributions and, instead, to contribute additional amounts to the Plan to fund such contributions, any remaining forfeitures shall be used for any permissible purpose, including but not limited to the payment of reasonable Plan expenses and/or the restoration of Account balances in accordance with §8.3(c)." Plan Doc. at 58.

## VI.    THE COMPANY'S FINANCIAL PERFORMANCE

78. During the Class Period, the Company experienced significant financial performance.

79. For example, total revenue in 2024 had increased by 27% to $247.1 billion, with shareholders net income for the year amounting to $12.12 per share. *See* Press Release https://newsroom.thecignagroup.com/2025-01-30-The-Cigna-Group-Reports-Fourth-Quarter-and-Full-Year-2024-Results,-Establishes-2025-Outlook-and-Increases-Dividend (last visited March 4, 2025).

19

80.     In the same press release, the Company's Board of Directors declared an 8% increase in the quarterly dividend to $1.51 per share and approved an increase in the share repurchase program. *Id*.

81.     Cigna's adjusted income from operations for 2024 was $7.7 billion, or $27.33 per share, compared with $7.4 billion, or $25.09 per share, for 2023. *Id*.

82.     Throughout the Class Period, Cigna achieved similarly positive financial results.

83.     In 2022, Cigna's adjusted income from operations was $7.3 billion, or $23.27 per share, and the Company's Board of Directors declared a 10% increase in the quarterly dividend rate to $1.23 per share.

84.     In 2021, Cigna's adjusted income from operations was $7.0 billion, or $20.47 per share, compared with $6.8 billion, or $18.45 per share in 2020.

85.     Thus, during the years of the putative class period, Cigna had sufficient cash and equivalents on hand to satisfy its contribution obligations to the Plan.

86.     Yet, despite this significant financial performance, Defendants consistently acted solely in their own self-interest, and in violation of their fiduciary duty to the Plan participants, by improperly using Forfeited Plan Assets solely to reduce Cigna's Plan contributions.

87.     In 2023, Defendants used Forfeited Plan Assets to reduce Cigna's contribution obligation by approximately $5.5 million while, upon information and belief, using no Forfeited Plan Assets to offset Plan expenses in direct violation of the Plan's terms.

88.     In 2022, Defendants used Forfeited Plan Assets to reduce Cigna's contribution obligation by approximately $3.8 million while, upon information and belief, using no Forfeited Plan Assets to offset Plan expenses in direct violation of the Plan's terms and their fiduciary duty of loyalty.

89.     In 2021, Defendants used Forfeited Plan Assets to reduce Cigna's contribution obligation by approximately $4.1 million while, upon information and belief, using no Forfeited Plan Assets to offset Plan expenses in direct violation of the Plan's terms and their fiduciary duty of loyalty.

90.     In 2020, Defendants used Forfeited Plan Assets to reduce Cigna's contribution obligation by approximately $3.2 million while, upon information and belief, using no Forfeited Plan Assets to offset Plan expenses in direct violation of the Plan's terms and their fiduciary duty of loyalty.

91.     In 2019, Defendants used Forfeited Plan Assets to reduce Cigna's contribution obligation by approximately $9.0 million, while, upon information and belief, using no Forfeited Plan Assets to offset Plan expenses in direct violation of the Plan's terms and their fiduciary duty of loyalty.

92.     Based on information gleaned from the Plan's Form 5500 for each of those years, from the beginning of the Class Period through 2024, a significant portion of $17.5 million was improperly steered from paying Plan administrative costs and instead used to benefit the Company.

93.     During the same period, the Plan incurred at least $10 million in administrative expenses.

94.     By using Forfeited Plan Assets during the Class Period exclusively to benefit Cigna by reducing its Plan contributions, Defendants failed in their fiduciary duty to the Plan and Plan participants by causing deductions from participant Plan accounts to cover expenses that otherwise could have been covered by Forfeited Plan Assets.

95.    In contrast, given the Company's significant financial performance, a prudent fiduciary in like circumstances would have defrayed expenses to the Plan's participants rather than defray costs to the employer.

96.    Defendants, at their own discretion, effectively placed their own interests above the interests of the Plan and its participants and caused harm to the Plan and its participants by reducing Plan assets, not allocating Forfeited Plan Assets to Plan participants' accounts, and also caused Plan participants to incur at least $10 million in expenses that could otherwise have been covered in whole or in part by Forfeited Plan Assets.

97.    Even assuming Defendants' actions were allowed under the Plan, the duty of prudence cannot be trumped by the instructions contained in the Plan. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (observing that Section 1104(a)(1)(D) "would make little sense if . . . the duty of prudence is defined by the aims of the particular plan as set out in the plan documents, since in that case the duty of prudence could never conflict with a plan document.").

## VII.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

98.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

99.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent

22

ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

100.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

101.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[7]

102.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

103.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

---

[7] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

104.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

105.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

106.    Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

107.    It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Cir. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

108.    It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

109.    To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

110.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes

24

(and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

111. In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Plan administrator to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto" and "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," as well as any committee's meeting minutes. This request was made on March 19, 2025.

112. By letter dated April 14, 2025, the Plan's administrator responded to Plaintiffs' request. No investment policy statement, to the extent it exists, or meeting minutes, to the extent they exist, were produced in response to Plaintiffs' request.

113. Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

114.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

115.    Defendants' breaches of its fiduciary duties, relating to its overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Cigna FIF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.      Defendants Breached Their Fiduciary Duties by Offering the Cigna FIF in the Plan**

**1.      The Plan's Inclusion of Cigna FIF**

116.    At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Cigna FIF.

117.    The Auditor's Reports attached the Form 5500s state as follows:

> The Plan's Fixed Income Fund is supported by four separate fully benefit-responsive investment contracts, including a traditional investment contract and three synthetic investment contracts. The Fixed Income Fund functions as a "fund of funds," and blends the crediting rates of the individual investment contracts to create a single melded crediting rate for the Fixed Income Fund. The melded rate approximates the rates of the supporting investment contracts and is utilized for Plan accounting purposes only. While EAIC does not guarantee, support or otherwise back the melded book value, participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at their melded book value.
>
> […]
>
> The key difference between a synthetic investment contract and a traditional investment contract is that the Plan owns the underlying assets of the synthetic investment contract. A synthetic investment contract includes a wrapper contract, which is an agreement for the wrap issuer insurance company to make payments to the Plan in certain circumstances. The wrapper contract typically includes certain conditions and limitations on the underlying assets owned by the Plan. With traditional investment contracts, the Plan owns only the contract itself and there are no reserves against contract value for the credit risk of the contract issuer.

Synthetic and traditional investment contracts are designed to accrue interest based on crediting rates established by the contract issuers. The synthetic investment contracts held by the Plan include three wrapper contracts with the Prudential Insurance Company of America ("PICA"), Voya Retirement Insurance and Annuity Company ("VRIAC"), and Massachusetts Mutual Life Insurance Company ("MassMutual"), each of which provide a guarantee that their crediting rate will not fall below 0 percent. Assets supporting these contracts are comprised of diversified fixed income securities. Cash flow volatility (for example, timing of benefit payments) as well as asset underperformance can be passed through to the Plan through adjustments to future contract crediting rates. Crediting rates are reviewed not less than annually for resetting, and any adjustments can then be passed through to participants, which would generally be performed through updating of the crediting rate for the Fixed Income Fund in order to bring the melded book value of the participants in line with the Plan's cumulative contract value on the four underlying fully benefit-responsive investment contracts.

The traditional investment contract held by the Plan is a guaranteed investment contract with EAIC. The contract issuer is contractually obligated to repay the principal and interest at a specified interest rate that is guaranteed to the Plan. The crediting rate is based on a formula established by the contract issuer but may not be less than 0 percent and is reviewed not less than annually for resetting.

The Plan's ability to receive amounts due in accordance with fully benefit-responsive investment contracts is dependent on the third-party issuer's ability to meet its financial obligations. The issuer's ability to meet its contractual obligations may be affected by future economic and regulatory developments.

Certain events might limit the ability of the Plan to transact at contract value with the contract issuer. These events may be different under each contract.

[…]

Note that if these certain events were to occur, the Plan may not be able to transact at contract value with the contract issuers and may elect to reflect any difference between market value and contract value by adjusting participants' melded book value in the Fixed Income Fund. It is possible that under such events participants' melded book value may decrease, however, the Plan Sponsor does not believe it is probable that such events will occur.[8]

---

[8] *See* Auditor's Report, attached to the 2023 Form 5500, at 14-15.

118.    For these reasons, Cigna FIF's crediting rates can be compared to traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (i) fully benefit-responsive, (ii) do not permit the insurance companies to terminate the agreements before the end of the contract, (iii) whose rates are reviewed regularly, and (iv) whose contracts are with creditworthy insurance carriers. The Cigna FIF's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Cigna FIF, therein making risk considerations equivalent. The Comparator GICs below meet these requirements.

119.    Defendants' selection and retention of the imprudent Cigna FIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 2.  Prudential is at a Substantial Risk of Going Insolvent

#### a.    The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable

120.    Because a guaranteed insurance account product is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer.  It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

121.    A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable.  It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011

> report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723.

122.    The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (i) Higher Risk Offshore Reinsurance and (ii) Higher-Risk, Less-Liquid and Investment Concentrations. *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf).[9]

123.    These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets.  This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

> **b.    Recent Lawsuits Have Highlighted Prudential's Extreme Risk of Going Insolvent**

124.    Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written

---

[9] The letter to The Hon.  Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

125. A recently filed lawsuit explained that a "cursory review of [Prudential's] statutory filings reveals a shocking dependence on affiliated party transactions with wholly owned affiliates and captive reinsurers and affiliates in Bermuda." *See Dempsey et al. v. Verizon Communications Inc. et al.*, No. 1:24-cv-10004-AKH (S.D.N.Y. Dec. 30, 2024) at ¶ 53.

126. The lawsuit further explained, among other things, that Prudential's surplus of $16 billion as of the end of 2023 paled in comparison to the alleged potential liabilities of $72.8 billion in affiliated party reinsurance and modified co-insurance ("Modco"). *Id.* at ¶¶ 53-54. In other words, given the meager surplus compared to the potential liabilities put Prudential at an extreme risk of insolvency.

c. **Empower's takeover of Prudential Did Not Alleviate the Severe Risk of Insolvency**

127. "On April 1, 2022, [Empower Annuity Insurance Company of America] completed the acquisition of all the voting equity interests in Prudential Retirement Insurance and Annuity Company, and subsequently renamed the entity to Empower Annuity Insurance Company, as part of the acquisition of …Prudential's Full Service retirement business." Annual Statement for the Year 2024 of Empower Annuity Insurance Company of America, Notes to Financial Statements.

128. As noted above, available surplus is an important data point in determining an L&A carrier's insolvency risk. Based on its insufficient surplus, Prudential/Empower was/is at severe risk of insolvency.

129. To begin, an important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better. The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger,

aggressive private equity-controlled carriers with much lower ratios. During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio. For example, as of 2024, Empower's S/L ratio was less than 1%:

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

### LIABILITIES, SURPLUS AND OTHER FUNDS

| | | 1 Current Year | 2 Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. | Surplus notes | 0 | |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | shares common (value included in Line 29 $        ) | | |
| 36.2 | shares preferred (value included in Line 30 $        ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $        in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus: $ 1,018,399,778    EAIC's 2024 Surplus to Liabilities
Total Liabilities: $ 106,414,669,390    Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**    **0.96%**    National Average is About **7.5%**.

130.    There are numerous L&A carriers that have substantially higher S/L ratios than Empower. For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | 1 | 2 |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | shares common (value included in Line 29 $        ) | | |
| 36.2 | shares preferred (value included in Line 30 $        ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $        in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

Total Surplus: $ 26,427,441,247    EAIC's 2024 Surplus to Liabilities
Total Liabilities: $ 218,473,153,964    Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**    **12.10%**    National Average is About **7.5%**.

　　　　d.    **Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus**

131.    Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America (Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.

132.    Separate and in addition to the reserve credit reported above, Empower has also entered into a ModCo reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:

32

133.    The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



134.    The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer.  There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.

135.    Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage," meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions. *See* n. 10.

e.      **Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid and Affiliated Investment Concentrations**

136.    Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

137.    The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



138. Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

***

139. In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

### 3. There are Many GICs in the Marketplace with Competitive Crediting Rates

140. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

141. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates were available to the Plan but were not selected by Defendants.

142. These comparisons include:

- The Pomona Valley Hospital Medical Center Retirement Savings Plan's fully benefit-responsive synthetic GIC, where multiple "traditional investment contracts held by the Plan are guaranteed investment contracts" with multiple "contract issuers." *See* Auditor's Report, attached to the 2023 Form 5500 for the Pomona Valley Hospital Medical Center Retirement Savings Plan, at Note E. "The crediting rates are reviewed quarterly" and, like the Cigna FIF, "the contracts cannot be terminated before the scheduled maturity date." *Id*. Also like the Cigna FIF, "[n]o events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*.

- The Baylor College of Medicine Retirement Plan offered a "fully benefit-responsive investment contract" that is "fully and unconditionally guaranteed by Lincoln National Life Insurance Company." Like the Cigna FIF, the "The Plan Administrator believes that any events that would limit the Plan's ability to transact at contract value are remote." *See* Auditor's Report, attached to the 2020 Form 5500 for the Baylor College of Medicine Retirement Plan, at Note 5.

- The Gemba Group Annuity Plan offered a synthetic GIC with multiple underlying "guaranteed investment contracts[,]" and the GIC cannot be cancelled "before the

scheduled maturity dates." Auditor's Report, attached to the 2021 Form 5500 for the Gemba Group Annuity Plan, at Note 4; *see also id*., at Line 4i (listing the insurance companies). Also like the Cigna FIF, "The Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id*. The Gemba Group Annuity Plan also has a "guaranteed fixed interest fund" which is also a Synthetic GIC because it has multiple "underlying fully benefit-responsive contracts" and, like the Cigna FIF, "The Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id*., at Note 5.

- The Holzer Health System 401(a) Profit Sharing Plan offered a Common collective trust, with multiple "underlying investments (consisting of guaranteed investment contracts, security-backed contracts and common collective trusts)" like the Cigna FIF. Auditor's Report, attached to the 2021 Form 5500 for the Holzer Health System 401(a) Profit Sharing Plan, at Note 3. "[T]he NAV of the fund is determined daily" and the "[u]nits are issued and redeemed" daily. *Id*. Hence, it was fully benefit-responsive. The assets are listed as assets of the plan. *Id*., at Schedule H.

- The Jackson National Life Insurance Company Defined Contribution Plan offered a fully benefit-responsive investment contract that was a "Company-sponsored" annuity "exclusively designed for use in connection with the Plan" and is "backed by the creditworthiness of the Company." *See* Auditor's Report, attached to the 2022 Form 5500 for the Jackson National Life Insurance Company Defined Contribution Plan, at Note 3. The Company (Jackson National Life Insurance Company) is the plan sponsor. Also, the crediting rate is "based on current market rates[,]" not risk. *Id*.

- The Transamerica 401(k) Retirement Savings Plan offered a fully benefit-responsive GIC with Transamerica Financial Life Insurance Company ("TFLIC"), an affiliate of the plan sponsor, Transamerica Corporation. The GIC "consists of stable fund segments" with each segment have "a guaranteed rate of interest" like a Synthetic GIC. Auditor's Report, attached to the 2019 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at page 9. The interest rate is determined quarterly. *Id*., at 10. Like the Cigna FIF, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id*., at 11. "TFLIC is not permitted to pay or transfer the value of the contract, without consent from the Plan, prior to the scheduled maturity date." *Id*.

- The Valley Children's Hospital Defined Contribution Retirement Plan offered "a fully benefit-responsive investment contract with Lincoln National Life Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Valley Children's Hospital Defined Contribution Retirement Plan, at Note 4. "The Plan administrator does not believe that any events that would limit the Plan's ability to transact at contract value with participants are probable of occurring." *Id*.

36

- The HCC Insurance Holdings Inc. 401(k) Plan offered a fully benefit responsive guaranteed investment contract where the "interest rates are reviewed on a quarterly basis for resetting." The guarantee is based on MassMutual's ability to meet its financial obligations from the general assets of MassMutual *id*., which is nonetheless comparable to the Cigna FIF because MassMutual was the same carrier as one of the underlying GICs in the Cigna FIF. And like the Cigna FIF, "The Plan administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable." Auditor's Report, attached to the 2019 Form 5500 for the HCC Insurance Holdings Inc. 401(k) Plan, at Note 4. The assets of the HCC insurance GIC are Plan assets, albeit held by MassMutual. *Id*., at Schedule H.

- The American United Life Progress Sharing Plan and Trust offered a "fully benefit-responsive fixed interest investment option with the Company" that "is maintained in the Company's general account" where the rates are "determined quarterly." Auditor's Report, attached to the 2020 Form 5500 for the American United Life Progress Sharing Plan and Trust, at Note 2. The insurance carrier is/was also the plan sponsor. Also, like the Cigna FIF, "[t]he Plan Administrator does not believe the occurrence of any such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id*.

- The Auto-Owners Insurance Company Retirement Savings Plan offered a "a fully benefit-responsive investment contract with Auto-Owners Life Insurance Company (AOLIC), a wholly owned subsidiary of Auto-Owners Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at Note 3. Like the Cigna FIF, "The plan administrator does not believe" that any events that "would limit the Plan's ability to transact at contract value" "is probable", and "The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*.

- The International Imaging Materials Inc. Retirement and Investment Plan offered a "traditional fully benefit-responsive investment contract. Auditor's Report, attached to the 2022 Form 5500 for the International Imaging Materials Inc. Retirement and Investment Plan, at Note 2. The crediting rates are determined "quarterly" and, like the Cigna FIF, "there are no events that limit the ability of the Plan to transact at contract value with the issuers." *Id*. Although "Lincoln Insurance maintain[s] the contributions in a general account fund" it is listed as plan assets. *Id*., at Note 2 and Schedule H. Rates are based on "factors, including economic and market conditions, the general interest rate environment and the expected and actual return on the portfolio within the general account[,]" not risk. *Id*. What Lincoln deemed reflective of the "economic and market conditions" should be the same for the Cigna FIF during the same "economic and market conditions."

- The Mattel, Inc. Personal Investment Plan offered a fully benefit-responsive "traditional GIC" where "the contract itself is owned by the Plan." Auditor's Report, attached to the 2023 Form 5500 for the Mattel, Inc. Personal Investment Plan, at Note 3. "The Plan's administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable" and "Mattel is unaware of any events which occurred during 2023 that would allow contract issuers to terminate the contracts held by the Plan." *Id.*

- The Trugreen Profit Sharing and Retirement Plan offered a "a traditional fully benefit-responsive guaranteed investment contract" with MassMutual, which is nonetheless comparable to the Cigna FIF because MassMutual was the same carrier as one of the underlying GICs in the Cigna FIF. Auditor's Report, attached to the 2021 Form 5500 for the Trugreen Profit Sharing and Retirement Plan, at Note 4. "The crediting rate is reviewed on a quarterly or semiannual basis for resetting. The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id.* "No events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id.* Although "MassMutual maintains the contributions in a general account[,]" *id.*, the assets are listed as plan assets. *Id.*, at Note 4, Schedule H.

143.    Comparing the above comparators to the Cigna FIF is an apples-to-apples comparison so to speak. Notably, the terms of the above stable value GICs are nearly identical, if not identical, to the Cigna FIF's terms.  Among other things, the terms provide that the crediting rates of all the GICS and the Cigna FIF be reviewed at least annually.  For example, the Cigna FIF "Crediting rates are reviewed not less than annually for resetting." Auditor's Report, attached to the 2023 Form 5500, at 14-15.

144.    By the time the Cigna FIF rates were reviewed, the fiduciaries would have had four quarters worth of data from numerous plans to consider. With so much information readily available numerous times a year to guide Defendants' decision making, they should have known the crediting rates were lower than the market was offering.

145.    It is also telling that the Cigna FIF contract enabled Defendants to go longer between reviewing crediting rates than most other stable value GICs, demonstrating less care by

Defendants than other fiduciaries of stable value GICs. It also created numerous missed opportunities to achieve better rates in the meantime.

146.    The Cigna FIF in the Plan had underwhelming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[10] |
|---|---|---|---|---|---|
| 2019 | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln Financial Group | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | | 77,695 | $9,922,258,471 | PRIAC | 3.80% |

---

[10] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | | |
|---|---|---|---|---|---|
| | **Cigna Group 401(k) Plan** | | | **PICA** | **2.76%** |
| | | | | **MassMut** | **3.10%** |
| | | | | **VRIAC** | **2.22%** |
| | | | | | |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Cigna Group 401(k) Plan** | **77,695** | **$9,922,258,471** | **PRIAC** | **3.20%** |
| | | | | **PICA** | **2.91%** |
| | | | | **MassMut** | **3.15%**[11] |
| | | | | **VRIAC** | **2.73%**[12] |
| | | | | | |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |

---

[11] January 1 to July 31, 3.16%, August 1 through December 31,  3.14%. *See* 2020 Form 5500, Schedule H, Line 4i – Schedule of Assets, at 38.

[12] January 1 to June 30, 2.97%, July 1 to December 31,  2.49%. *See* 2020 Form 5500, Schedule H, Line 4i – Schedule of Assets, at 20.

| | | | | | |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Cigna Group 401(k) Plan** | **77,695** | **$9,922,258,471** | **PRIAC** | **3.20%** |
| | | | | **PICA** | **2.91%** |
| | | | | **MassMut** | **3.11%** |
| | | | | **VRIAC** | **2.73%**[13] |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Trugreen Profit Sharing and | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |

---

[13] January 1 to June 30, 2.97%, July 1 to December 31, 2.49%. *See* 2021 Form 5500, Schedule H, Line 4i – Schedule of Assets, at 1.

| | | | | | |
|---|---|---|---|---|---|
| | Retirement Plan | | | | |
| | **Cigna Group 401(k) Plan** | **77,695** | **$9,922,258,471** | **PRIAC**[14] | **3.20%** |
| | | | | **PICA** | **2.91%** |
| | | | | **MassMut** | **3.00%** |
| | | | | **VRIAC** | **2.73%**[15] |
| | | | | | |
| 2023 | The Valley Children's Hospital Defined Contribution Retirement Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Cigna Group 401(k) Plan** | **77,695** | **$9,922,258,471** | **PRIAC**[16] | **2.60%**[17] |
| | | | | **PICA** | **2.92%** |
| | | | | **MassMut** | **3.60%** |

---

[14] "PRIAC" and not "EAIC" identified in 2022 Form 5500, despite Empower's acquisition of PRIAC on April 1, 2022. *See* 2022 Form 5500, Schedule H, Line 4i – Schedule of Assets, at 18.

[15] January 1 to June 30, 2.97%, July 1 to December 31, 2.49%. *See* 2022 Form 5500, Schedule H, Line 4i – Schedule of Assets, at 18.

[16] "PRIAC" and not "EAIC" identified in 2023 Form 5500, despite Empower's acquisition of PRIAC on April 1, 2022. *See* 2023 Form 5500, Schedule H, Line 4i – Schedule of Assets, at 19.

[17] January 1 to June 30, 2.50%, July 1 to December 31, 2.70%. *See* 2023 Form 5500, Schedule H, Line 4i – Schedule of Assets, at 19.

| | | | VRIAC | 2.96% |
|---|---|---|---|---|

147. Throughout the Class Period, the Cigna FIF underperformed the comparator funds by an average of over 24% as demonstrated in the table below.

| Year | Cigna FIF Average Rate of Return | Comparator Average Rate of Return | Cigna FIF Percentage of Underperformance |
|---|---|---|---|
| 2019 | 2.97% | 3.94% | 24.62% |
| 2020 | 3.00% | 3.75% | 20.00% |
| 2021 | 2.99% | 4.19% | 28.64% |
| 2022 | 2.96% | 4.06% | 27.09% |
| 2023 | 3.02% | 3.85% | 21.56% |
| **Average Underperformance during Class Period** | | | **24.38%** |

148. Notably, in 2021 the Cigna FIF's crediting rate decreased while the Comparator GIC's crediting rates increased, indicating Defendants' failure to adequately investigate the prevailing marketplace and achieve similar adjustments in the same economy. The belated increase in 2023 was still insufficient to bring the crediting rates in line with the prevailing marketplace and meaningful returns.

149. The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Cigna FIF's dismal crediting rate.

150. Again, specific Comparator GICs used herein all had similar risk considerations based on their terms, the creditworthiness of their insurance carriers, and the fact that their plan administrators did not believe it probable that any plan or sponsor event would limit the ability of the Plan to transact at contract value. Indeed, some of the Comparator GICs had the same insurance carriers as the Cigna FIF. The Comparator GICs were all fully benefit-responsive and their

crediting rates were all regularly reviewed in the same prevailing marketplace and economic circumstances as the Cigna FIF.

151. The Cigna FIF should be achieving at least the same performance of traditional guaranteed investment contracts.

152. In short, because the Plan held almost $10 billion in assets under management at the start of the Class Period, it had considerable leverage to bargain for higher crediting rates.

153. A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or by submitting requests for proposals to the Insurance Companies and other providers of stable value investments.

154. By selecting the Cigna FIF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments without needing to take on more risk.

155. With the massive amount of assets under management in the Cigna FIF, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[18]

    **C.**    **Relevant Terms of the Plan Relating to Forfeited Plan Assets and Plan Expenses**

---

[18] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

156.    As mentioned *supra,* to the extent a Plan Participant is not 100% vested upon termination of employment, the Plan Participant forfeits the value of Company contributions (hereafter "Forfeited Plan Assets") in their account on the earlier of the date the Participant takes a distribution of their vested interest in the Plan or the date the Plan Participant incurs a five-consecutive-year break in vesting service (within the meaning of the Plan Document).

157.    With respect to the application of Forfeited Plan Assets, prior to January 1, 2025, "Cigna use[d] forfeited funds first to pay expenses of the Plan (other than routine administrative expenses) as directed and approved by the Plan Administrator, and second, to reduce the cost of future company matching contributions." SPD at 24.

158.    As of January 1, 2025, Section 8.3(b) of the Plan provides as follows:

Application of Forfeited Amounts. The amount in a Participant's Account which is forfeited in accordance with § 8.3(a)(1) shall, during the continuation of the Plan, be applied towards the contributions made pursuant to §§ 3.4, 3.5 and 3.6. *To the extent the Participating Companies choose not to apply all or any portion of such forfeitures towards such contributions* and, instead, to contribute additional amounts to the Plan to fund such contributions, *any remaining forfeitures shall be used for* any permissible purpose, including but not limited to *the payment of reasonable Plan expenses* and/or the restoration of Account balances in accordance with §8.3(c).

(emphasis added).

159.    Accordingly, the terms of the Plan give discretion to Plan Fiduciaries to act in compliance with ERISA with respect to determining whether to use Forfeited Plan Assets to reduce employer contributions or apply Forfeited Plan Assets to defray Plan expenses.

160.    With respect to Plan expenses, the terms of the Plan provide that "[a]ll reasonable expenses necessary to operate and administer this Plan shall be borne by this Plan unless [Company] and/or other Participating Companies elect to pay them." Plan Doc., § 14.3.

161.    Accordingly, when the Company declined to pay for Plan expenses, the Plan Fiduciaries could choose between two alternative options with respect to the payment of Plan expenses. The first alternative would be to use Forfeited Plan Assets to defray at least a portion of Plan expenses consistent with ERISA's requirements and the discretion under the terms of the Plan Document. The second alternative is to require the Plan Participants to pay for Plan expenses through deductions from their individual accounts.

162.    The Plan authorizes the Committee to be a "named fiduciary" within the meaning of ERISA with exclusive authority and discretion to control and manage the operation and administration of the Plan.

**D.      The Illegal Conduct and Use of Forfeited Plan Assets by Plan Fiduciaries**

163.    Throughout the Class Period, Defendants directed and authorized tens of thousands of transactions, either directly or indirectly, extracting money from the Plan and/or accounts of Plan Participants to pay tens of millions for Plan expenses to parties in interest including, but not necessarily limited to, Prudential Retirement Insurance and Annuity Company (PRIAC), Prudential Bank and Trust, Prudential Insurance Co., Empower Trust Company, and Mercer Investment, Inc.

164.    The transactions representing direct compensation paid by Plan Participants are memorialized in the statements received by each Plan Participant and are also memorialized in plan level accounting, e.g., a trust report of the Plan. For example, throughout the Class Period the accounts of each of the Plaintiffs were directly reduced by amounts withdrawn to pay Plan administration fees.

165.    Moreover, throughout at least a portion of the Class Period, Defendants directed and authorized Plan participants to pay at least one party in interest a currently indeterminable amount of indirect compensation to cover Plan expenses.[19]

166.    Defendants failed to act in accordance with the terms of the Plan Document and ERISA to direct the use of Forfeited Plan Assets to defray the fees that Defendants instead required the Plan and Plan Participants to pay through causing transactions from Plan Participants' individual accounts as well as transactions from the Plan to parties in interest.

167.    Throughout the Class Period, Defendants also caused the Plan to engage in at least one transaction (and as many as 26 or more)[20] each year with a party in interest, i.e., the Company, related to the Company's contractual obligation to make matching contributions in excess of $1.2B to the Plan.[21]

---

[19] Defendants are solely in possession of the data and information to determine the accurate amounts.

[20] Defendants are solely in possession of the data and information to determine how many of these transactions involved calculations related to the use of Forfeited Plan Assets to offset Company's contractual obligations to the Plan.

[21] It is worth noting that ERISA and DOL regulations reflect a clear and longstanding policy intent to ensure that the deferrals of Plan Participants are promptly invested pursuant to the direction each Plan Participant and are not allowed to sit in unallocated plan-level accounts, which are typically invested in cash or a cash equivalent thereby depriving Plan Participants from the potential for investment earnings. *See, e.g.,* DOL Advisory Opinion 2002-02A (requiring that plan fiduciaries minimize the time between employee deferrals and investment pursuant to plan participant direction); *see also* 29 C.F.R. § 2510.3-102 (noting that plan assets "include participant contributions as of the earliest date they can reasonably be segregated" from plan assets); Field Assistance Bulletin 2008-01 (noting that participant contributions "that are withheld from wages or paid to the employer are delinquent if they become plan assets while still in the hands of the employer."). Thus, to the extent that the Plan Fiduciaries caused Forfeited Plan Assets to sit in an unallocated plan-level account for a long period of time instead of using the Forfeited Plan Assets to immediately defray plan expenses *and* provide benefits, then that would be additional imprudent and disloyal conduct. *See*, e.g., IRS "Retirement News for Employers," Vol. 7, Spring 2010 (stating forfeitures "must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise."); 29 C.F.R. § 2510.3-102 (61 Fed. Reg. 41220, Aug. 7 1996) (noting that "the Department is concerned that participant contributions be paid promptly into the plan so as to begin

168.    In other words, at least once each year, the Plan Fiduciaries engaged in calculations for the express purpose of calculating how to provide a benefit to the Company by causing a transaction, which exchanged Forfeited Plan Assets for money owed by Company to the Plan.[22]

169.    As noted above, each of these transactions is also memorialized in Plan trust reports. Each of these transactions (i.e., Company's reduced contribution of Company assets plus the use of Forfeited Plan Assets) served to provide the assets necessary to execute tens of thousands of transactions to invest some combination of Company contributions and Forfeited Plan Assets pursuant to the investment instructions of Plan Participants.

170.    In other words, each of these transactions involves the receipt of Company contributions and calculations related to Forfeited Plan Assets to enable a combination of Forfeited Plan Assets and Company contributions to be combined for use in following the investment instructions of thousands of Plan Participants.

171.    As part of the same conduct, at least once a year, Defendants caused the Plan to engage in transactions that both directly and indirectly provided a benefit to a party in interest, *i.e.*, the Company, in the amount of Forfeited Plan Assets (and any interest earned thereon) used to reduce the Company's contractual obligation to the Plan.

---

to earn interest or other investment returns and to be available for the payment of benefits."); Field Assistance Bulletin No. 2002-03 (noting concern about interest earned "on contributions pending investment direction" and requiring that float be "regarded by plan fiduciaries and service providers as part of the service provider's compensation"). Accordingly, interest (float) earned on Forfeited Plan Assets sitting in an unallocated plan-level account both inures to the benefit of the employer when the plan fiduciaries use that interest (float) to reduce the employer's contributions and also deprives plan participants of the potential for investment earnings.

[22] It is worth noting that "transactions" under 29 U.S.C. § 1106 are not limited to the use, transfer, or exchange of money that has not yet entered the plan trust. *See* Field Assistance Bulletin 2008-01 (stating an "employer continuing to hold participant contributions commingled with its general assets after the participant contributions reasonably could have been segregated will have engaged in a prohibited transaction in violation of ERISA section 406.).

48

172.    The Plan Fiduciaries engaged in this conduct for the primary purpose of providing a benefit to the Company, and not, as required, for the exclusive purpose of providing retirement benefits to Plan Participants and defraying Plan expenses.

173.    Additionally, Defendants caused the Plan to engage in these transactions with the Company that constituted and resulted in a use of Forfeited Plan Assets for the direct and indirect benefit of a party in interest, *i.e.*, the Company.

174.    During the Class Period, by directing, authorizing, and causing several transactions with the Company and tens of thousands of transactions with Plan Participants, Defendants dealt with the Forfeited Plan Assets in their own individual interest and in the Company's interest by using Forfeited Plan Assets to offset the Company's contractual obligations to the Plan.

175.    During the Class Period, by directing, authorizing, and causing several transactions with the Company and tens of thousands of transactions with Plan Participants, the individual Plan Fiduciaries acted in their individual capacity and as agents of a party in interest, *i.e.*, the Company, whose interests are adverse to the Plan or Plan Participants.

176.    Throughout the Class Period, by directing, authorizing, and causing several transactions with the Company and tens of thousands of transactions with Plan Participants, the individual Plan Fiduciaries received consideration for their own personal accounts from the Company as a result of their control over the transactions described above with a party in interest, *i.e.*, the Company, involving the Forfeited Plan Assets, that enabled the Company to reduce its costs and increase its profits thereby benefiting each individual Plan Fiduciary.[23]

---

[23] Individual Defendant Plan Fiduciaries are highly compensated employees of Company and often receive individual increased compensation and other benefits and bonuses as the profits of Company increase.

177.    All Plan Participants, including Plaintiffs, have been harmed by the conduct of the Plan Fiduciaries. Defendants' failure to abide by the requirements of ERISA by failing to use Forfeited Plan Assets for the exclusive purpose of providing retirement benefits to Plan Participants *and* defraying plan expenses has caused the value of the accounts of all Plan Participants to be lower than they would be absent the illegal conduct of the Plan Fiduciaries.

178.    During the Class Period, Plan Fiduciaries disloyally and imprudently benefited the Company by continuously prioritizing the use of Forfeited Plan Assets to reduce the Company's required employer matching contribution obligations rather than using those Forfeited Plan Assets to pay Plan expenses both directly charged to Plan Participants' accounts as well as indirectly through indirect compensation paid to other parties in interest through the operating expense of investment options in the Plan.

179.    During the Class Period, the Plan paid direct and/or indirect compensation for services to administer the plan ranging from, among others, recordkeeping and information management, administration, accounting, consulting, loan processing, and investment management services. The Plan also paid other types of fees. Hereinafter the payment for services from Plan assets (directly or indirectly) shall collectively be referred to as "Administrative Expenses."

180.    The discretion given to the Plan Fiduciaries under the terms of the Plan and ERISA created a conflict of interest with respect to the Plan Fiduciaries' use of Forfeited Plan Assets. In other words, the Plan Fiduciaries' failure to allocate Forfeited Plan Assets to defray plan expenses, despite the performance of the Company, improperly benefited the Company. All else being equal, had the Plan Fiduciaries followed ERISA and allocated the Forfeited Plan Assets to defray Plan

expenses, the result, which would be unfavorable to the Company, is that its profits would have been lowered by more than $17,000,000 during the Class Period.

181.    In other words, if the Plan Fiduciaries had not used their discretion, despite having multiple other options available under the Plan and ERISA, to reduce employer contributions with plan assets, then *over $17,000,000 in additional assets would have been available to the Plan* and been able to be invested by the Plan Participants.

182.    The conflict of interest caused the Plan Fiduciaries to make their decisions on the use of the Forfeited Plan Assets primarily in the interest of the Company, and for the exclusive purpose of reducing the amount of money the Company had to pay to fulfill its promises to the Plan to make several types of matching contributions (including non-discretionary Safe Harbor matching contributions) thereby adding millions of dollars to the bottom-line profit of the Company.

183.    Given the blatant conflict of interest, Defendants should have retained an independent fiduciary to oversee the decision making process.

184.    During the Class Period, the Plan Fiduciaries were motivated by self-interest and/or the interest of the Company when failing to use unallocated Forfeited Plan Assets of over $17,000,000 to defray Plan expenses.

185.    There are no facts or circumstances throughout the Class Period that make the Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce the Company contributions consistent with discharging their duties with respect to the Plan *solely* in the interest of the participants and beneficiaries and for (i) the exclusive purpose of providing benefits to participants and their beneficiaries; *and* (ii) defraying reasonable expenses of administering the Plan.

51

186.    Even if there is a risk that the Company may be financially unable to satisfy its contribution obligations, defraying Plan expenses is the better option for Plan Participants.

187.    If the Company were to declare bankruptcy, the Plan would have a claim against the Company for the full value of Company's obligation to make matching contributions.[24] In many bankruptcy situations a Company may go through a reorganization and be able to make good on 100% of its obligations to the Plan. On the other hand, Plan participants' assets that are used to pay Plan expenses will never be returned to the Plan participants if the Company were to file bankruptcy.

188.    Thus, the Plan Fiduciaries' use of the Forfeited Plan Assets "to reduce" employer contributions is never in the best interest of Plan Participants, as Plan participants then pay for all the Plan's expenses out of their individual accounts, leaving Plan participants with less assets for distribution or investment.

189.    Accordingly, the Plan Fiduciaries' use of Forfeited Plan Assets to pay Plan expenses is in this context, better for Plan Participants compared to other alternatives.

190.    Under the minimum standard of care under the circumstances then prevailing, a prudent Plan Fiduciary having the discretion to select among several options related to the allocation of Forfeited Plan Assets, acting solely in the interest of the Plan Participants and beneficiaries and for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of administering the Plan, would choose options that would ensure that Forfeited Plan Assets were allocated during the same year in which they arose and ensure that the Forfeited Plan Assets were used to both provide retirement benefits and defray Plan expenses.

---

[24] *See,* Field Assistance Bulletin 2008-01 stating ("when an employer fails to make a required contribution to a plan in accordance with the plan documents, the plan has a claim against the employer for the contribution, and that claim is an asset of the plan.").

191.    As described in detail above, throughout the Class Period, the Plan Fiduciaries exercised discretion over, and control of, Plan assets when directing the use of Plan participants' accounts to pay Plan expenses[25]s to service providers.

192.    For example, during 2019, the terms of the Plan obligated the Company to make contributions to the Plan in the amount of at least $160,528,630.

193.    During 2019, Plan Fiduciaries had the discretion and ability to require the Company to make matching contributions in the amount of at least $160,528,630. Instead, Plan Fiduciaries allowed the Company to offset its obligation to make contributions of at least $160,528,630 by allocating $900,000 of Forfeited Plan Assets towards the Company's obligation under the terms of the Plan thereby saving $900,000 that flowed directly to the Company's bottom line profit.

194.    During 2019, instead of using the Forfeited Plan Assets, or at a minimum the $900,000 allocated to the Company's contribution, to reduce Plan expenses, the Plan Fiduciaries caused Plan Participants to pay a minimum of $2,382,197 in Plan expenses through deductions from the accounts of Plan Participants and also caused Plan Participants to pay thousands of dollars in Administrative Expenses indirectly through revenue sharing or other similar methods (in other words, some of the Plan expenses were paid indirectly from the total operating expenses of the Plan's investment options).

195.    For the remainder of the Class Period, Defendants continued the same illegal, disloyal, imprudent, and prohibited conduct outlined in detail above in 2019, thereby causing similar additional losses to the Plan and Plan Participants.

---

[25] Unlike most Plan Sponsors, Defendants' Form 5500s do not disclose the amount of Forfeited Plan Assets that were left in an unallocated account at the end of each calendar year.  Based on the terms of the Plan document as of January 1, 2025 it is likely that amounts were unallocated at year end carried over to the following calendar year.

196.    During the Class Period, Plan Fiduciaries improperly used their discretion with respect to Forfeited Plan Assets, or violated the terms of the Plan, in a manner that solely benefited the Company, a party in interest, by millions of dollars at the expense of the Plan and Plan Participants.

197.    According to information from the Plan's Form 5500s, the following represents the amount of the forfeitures improperly used to offset Cigna's contributions to the Plan, and the amounts used to pay for Plan administration expenses:

| Plan Year | Company Contributions | Offset Plan Expenses |
|---|---|---|
| 2019 | $       900,000.00 | $0 |
| 2020 | $    3,200,000.00 | $0 |
| 2021 | $    4,100,000.00 | $0 |
| 2022 | $    3,800,000.00 | $0 |
| 2023 | $    5,500,000.00 | $0 |
| **Total** | **$  17,500,000.00** | **$0** |

## VIII.   CLASS ACTION ALLEGATIONS[26]

198.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed Class:

> All persons, except Defendants and any fiduciary of the Plan and their immediate family members, who were participants in or beneficiaries of The Cigna Group 401(k) Plan (f/k/a the Cigna

---

[26] Although this is a proposed class action, the allegations in this complaint are alternatively pleaded in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

401(k) Plan) at any time between May 14, 2019 to the date of judgment (*i.e.*, the Class Period).[27]

199.    Numerosity: The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 88,684 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500, at 2.

200.    Typicality: Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

201.    Common Questions of Law and Fact Predominate: There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

b.      Whether Defendants are fiduciaries of the Plan;

c.      Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

d.      The proper form of equitable and injunctive relief; and

e.      The proper measure of monetary relief.

202.    Adequacy: Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.

---

[27] Plaintiffs reserve their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

203. Superiority: A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

204. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to

individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

205.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## IX.    CAUSES OF ACTION

### COUNT I
### Breaches of Fiduciary Duty of Prudence
### (against the Committee Defendants)

206.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

207.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

208.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

209.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

210.    When exercising control over Forfeited Plan Assets and using them to reduce Company contributions, the Prudence Defendants failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act *solely* in the interest of the Plan Participants and beneficiaries **and for the exclusive purpose of providing benefits to Plan Participants** and their beneficiaries **and defraying reasonable expenses** of administering the plan, in violation of ERISA.

211.    Additionally, prior to January 1, 2025, when improperly exercising discretion and control over Forfeited Plan Assets, and failing to use them first to defray the reasonable costs of administering the Plan, contrary to the explicit terms of the Plan Document, the Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act *solely* in the interest of the Plan Participants and beneficiaries **and for the exclusive purpose of providing benefits to Plan Participants** and their beneficiaries **and defraying reasonable expenses** of administering the plan, in violation of ERISA.

212.    When deciding how to allocate Forfeited Plan Assets, Defendants utilized an imprudent and flawed process. Despite the conflict of interest presented by alternatives under both

ERISA and the Plan Document, Defendants failed to undertake any reasoned and impartial decision-making process, including failure to retain and independent fiduciary, to determine whether using the Forfeited Plan Assets to reduce the Company's own contribution expenses, as opposed paying Plan expenses or for other purposes allowable under ERISA, was in the best interest of the Plan Participants or was prudent, and failed to *solely* consider which alternative would promote the **exclusive purpose of providing benefits to Plan Participants** and their beneficiaries **and defraying reasonable expenses** of administering the plan, in violation of ERISA.

213. By refusing to use Forfeited Plan Assets to eliminate Plan expenses that were instead charged to Plan Participants' accounts, and instead deciding to use these Plan assets to reduce the Company's own contribution expenses, Defendants imprudently caused the value of the Plan's assets to decrease by causing participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan expenses.

214. Had Defendants conformed with the minimum standard of care required under ERISA, Defendants (Plan Fiduciaries) would not have used Forfeited Plan Assets to reduce Company contributions.

215. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan's participants would have had more money available to them for their retirement.

216. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

217. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Breach of the Duty to Follow the Terms of the Plan Document**
**(against the Committee Defendants)**
**(29 U.S.C. 1104(a)(1)(D))**

218. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

219. As alleged herein, 29 U.S.C. 1104(a)(1)(D) imposes a fiduciary duty to act in accordance with the Plan documents and instruments governing the Plan.

220. During some portion of the Class period prior to January 1, 2025, the Plan required the Defendants to use the Forfeited Plan Assets to pay Administrative Expenses (both direct and indirect) prior to using Forfeited Plan Assets to reduce Company's non-discretionary and declared matching contributions.

221. During some portion of the Class period prior to January 1, 2025, Defendants failed to discharge their duty to act in accordance with the Plan document by using Forfeited Plan Assets to reduce employer non-discretionary and declared matching contributions in violation of the explicit terms of the Plan.

222. As a direct and proximate result of Defendants' fiduciary breaches described herein, the Plan and class suffered injury and loss for which Defendants are personally liable and the Plan and Plan participants and beneficiaries are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty to follow the terms of the Plan document.

223. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

224. Plaintiffs and the class have suffered losses as a direct result of the Defendants' conduct and breach of their fiduciary duty to follow the terms of the Plan document.

### COUNT III
### Breaches of Fiduciary Duty of Loyalty
### (against All Defendants)

225. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

226. At all relevant times, the Company and the Committee Defendants ("Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

227. As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

228.    Pursuant to 29 U.S.C. § 1104(a)(1)(A), the Loyalty Defendants were required to discharge their duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

229.    The Loyalty Defendants failed to exercise their duty of loyalty to the Plan and its participants by utilizing forfeited funds in the Plan for the benefit of Cigna instead of the sole interest of the Plan participants and beneficiaries.

230.    The Loyalty Defendants used these Plan assets for the purpose of reducing Cigna's contributions to the Plan, thereby saving Cigna millions of dollars each year at the expense of the Plan which received decreased employer contributions, and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

231.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses.

232.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

233.    Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT IV**
**Breach of ERISA's Anti-Inurement Provision**
**(against All Defendants)**

234.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

62

235. Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

236. Because all forfeited Plan participant funds are initially placed in the Plan's trust, these forfeited funds are Plan assets.

237. The use of the forfeited funds to defray employer contributions to the Plan in order to save the employer millions of dollars in funds that the employer would otherwise have to contribute to the Plan, caused the assets of the Plan to inure to the benefit of the employer in violation of 29 U.S.C. § 1103(c)(1).

238. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Defendants are liable to restore to the Plan all losses caused by their breaches of ERISA's anti-inurement provision, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

239. Each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT V**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Company)**

240. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

63

241. Cigna had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and was aware that the Committee had critical responsibilities as fiduciaries of the Plan.

242. Cigna is referred to as the "Monitoring Defendant."

243. In light of its authority, the Monitoring Defendant had a duty to monitor the Committee and to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

244. The Monitoring Defendant also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

245. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee, or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of its imprudent actions and omissions.

246. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

247. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee.

In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## COUNT VI
## Prohibited Transactions
## (against all Defendants)

248.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

249.     29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . exchange . . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

250.     Defendants are parties in interest, as that term is defined under 29 U.S.C. § 1002 (14), because they are Plan fiduciaries and because Company is the employer of Plan participants.

251.     The Plan's third-party administrators and other service providers are also parties in interest. *See* Cunningham, 145 S. Ct. at 1025 ("[ERISA], in turn defines a "party in interest'" to include various plan insiders, including the plan's administrator, sponsor, and its officers, as well as entities providing services to [the] plan.") (internal citations omitted).

252.     When Defendants elected to use forfeited Plan assets as a substitute for future employer contributions to the Plan, thereby saving Company millions of dollars in contribution expenses, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the benefit of a party in interest.

253.     When Defendants elected to cause thousands of transactions that reduced the value of the accounts of Plan participants to pay service providers and parties in interest to the plan for

the exclusive purpose of allowing Company to reduce its obligation to make matching contributions, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the benefit of a party in interest.

254.    Additionally, when Defendants elected to use Forfeited Plan Assets as a substitute for declared matching contributions to the Plan and not for Plan Expenses, Defendants caused the Plan to engage in prohibited transactions with the Plan's third-party administrator and other service providers for the payment of Plan Expenses from Plaintiff and all Plan Participants' individual accounts that were sent to the Plan's third-party administrators and other third party service providers and that should have been paid in part or in full by the Forfeited Plan Assets.

255.    As a result of these prohibited transactions, Defendants caused the Plan to suffer losses in the amount of the forfeited Plan assets that were substituted for employer matching contributions and lost investment returns on those assets.

256.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

## COUNT VII
### Prohibited Transactions/Self-Dealing
### (against all Defendants)

257.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

258.    29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or

66

in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

259.    Defendants were and continue to be Plan Fiduciaries. In their management and control of Forfeited Plan Assets, Defendants caused the Plan to use Forfeited Plan Assets to fund Company's contractual obligation to make employer matching contributions to the Plan. By allocating these Plan assets toward offsetting Company's contribution obligations, Defendants saved Company millions of dollars in employer matching contribution expenses. Defendants therefore dealt with the assets of the Plan in their own interest or for Company's own account, in violation of 29 U.S.C. § 1106(b)(1).

260.    Additionally, Defendants in their individual capacity or as agents of Defendant Company acted in a transaction involving the Plan on behalf of a party (Company Defendant) whose interests are adverse to the interests of the Plan and the interests of Plan participants and their beneficiaries in violation of 29 U.S.C. § 1106(b)(2) and received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the forfeited Plan assets in violation of 29 U.S.C. § 1106(b)(3).

261.    As a result of this prohibited conduct, Defendants caused the Plan and Plan participants (the Class) to suffer losses in the amount of the Plan assets that were substituted for employer matching contributions and lost earnings on those assets.

262.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore

67

to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Company's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

68

G.    An order enjoining Defendants from any further violations of its ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress the Company's illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: September 29, 2025                     Respectfully submitted,

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
James A. Maro, Esquire
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email:  markg@capozziadler.com
           jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080

**MUHIC LAW LLC**
Peter A. Muhic, Esquire
923 Haddonfield Road, Suite 300
Cherry Hill, NJ  08002
Email:  peter@muhiclaw.com
Tel.: (856) 324-8252
Fax: (717) 232-3080

**LYNCH CARPENTER, LLP**
Gerald D. Wells, III, Esquire, (PA ID No. 88277)
Stephen E. Connolly, Equire, (PA ID No. 86130)

1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Email:  jerry@lcllp.com
        steve@lcllp.com
Tel.: (412) 322-9243
Fax: (412) 231-0246

**THE SHARMAN LAW FIRM LLC**
Paul J. Sharman, Equire
11175 Cicero Drive, Suite 100
Alpharetta, GA 30022
Email:  paul@sharman-law.com
Tel.: (678) 242-5297
Fax: (678) 802-2129

Andrew W. Ferich, Equire, (PA I.D. 313696)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Email: aferich@ahdootwolfson.com
Tele.: (310) 474-9111
Facsimile: (310) 474-8585

*Counsel for Plaintiffs and the Putative Class*

70